

**FILED**

**JUL 3 1 2014**

U.S. COURT OF
FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| Certain Underwriters at Lloyds London, each severally subscribing to insurance policies each for his own part and not one for the other numbered AE2141B, VS5057L, and AG1126E<br>2 Minster Court<br>London EC3<br>ENGLAND<br><br>and<br><br>New York Marine and General Insurance Company<br>919 Third Avenue<br>10th Floor<br>New York, NY<br><br>and<br><br>Aviation & General Insurance Company, Ltd.<br>New Broad Street House<br>35 New Broad Street<br>London EC2M 1NH<br>ENGLAND<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant. | No. 14- 687C |

### COMPLAINT

Plaintiffs, Certain Underwriters at Lloyds London, each severally subscribing to insurance policies each for his own part and not one for the other, numbered AE2141B, VS5057L, and AG1126E ("Certain Underwriters"); New York Marine and General

Insurance Company ("New York Marine"); and Aviation & General Insurance Company, Ltd. ("Aviation & General") by their undersigned counsel, as and for their Complaint against Defendant United States ("United States" or "Defendant"), hereby allege that the United States deprived them of their property without paying them just compensation in violation of the U.S. Constitution. The United States' actions deprived Plaintiffs of two separate, legally cognizable claims before the United States federal court system. Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      In violation of the Just Compensation Clause of the Fifth Amendment of the United States Constitution, the United States took the property of Plaintiffs Certain Underwriters, New York Marine, and Aviation & General in the form of their legally cognizable Foreign Sovereign Immunities Act claims against the government of Libya ("Libya") for its role in the destruction of Egypt Air Flight 648 on November 23, 1985. The United States' actions in furtherance of restoring "normal" relations with Libya directly resulted in the taking of Plaintiffs' judicially cognizable claims against Libya.

2.      In violation of the Just Compensation Clause of the Fifth Amendment of the United States Constitution, the United States also took the property of Certain Underwriters and Aviation & General in the form of their legally cognizable claims against Libya for its role in the destruction of Pan American World Airways ("Pan Am") Flight 103 on December 21, 1988. This is an additional and separate deprivation of Plaintiffs Certain Underwriters' and Aviation & General's property without just compensation in violation of the U.S. Constitution. The United States' actions in

2

furtherance of restoring "normal" relations with Libya directly resulted in the taking of Plaintiffs' judicially cognizable claims against Libya.

3. After Libyan-sponsored terrorists destroyed Egypt Air Flight 648 in 1985 and Pan Am 103 in 1988, killing hundreds of civilians, Plaintiffs Certain Underwriters, New York Marine, and Aviation & General as reinsurance companies for the aircraft and airline faithfully adhered to the governing insurance agreements for each terrorism-caused disaster.

4. Plaintiffs Certain Underwriters, New York Marine and Aviation & General were damaged in the amount of approximately $41,552,417.55 in performance of their contractual obligations resulting from the destruction of the Egypt Air Flight 648 aircraft hull.

5. Plaintiffs Certain Underwriters and Aviation & General were damaged in the amount of approximately $55,000,000[1] in the performance of their contractual obligations resulting from the destruction of Pan Am 103 and payment of claims by the family members of the victims.

6. Plaintiffs obtained a right to pursue relief against the primary tortfeasor that caused the destruction of the two different aircraft. Plaintiffs then sued Libya under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*, in two separate actions[2], which were terminated by the actions of the United States government,

---

[1] This damage figure severely underestimates Certain Underwriters' and Aviation & General's true damages, which have more than doubled since the date of the loss, because it does not include a computation for the accrued interest.

[2] *Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 98-3096 (TFH) (D.D.C filed December 18, 1998); *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 06-731 (GK) (D.D.C. filed April 21, 2006).

described below in 2008. By terminating Plaintiffs' judicially-cognizable legal rights without any recourse or possibility of any compensation whatever, the United States has insulated Libya from responsibility for the cost of Libyan-sponsored terrorism, instead forcing Plaintiffs to bear the expense of compensating the victims of this carnage with no means of indemnification.

7. That Plaintiffs had a right to compensation from Libya is beyond doubt. One of the U.S federal courts hearing those cases rendered a decision against Libya in *Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*.[3] The other court rendered a decision against the government of Syria, Libya's co-conspirator in *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya*[4] subsequent to the United States' deprivation of Plaintiffs' claim against Libya in that case. If the plaintiffs in *Certain Underwriters at Lloyd's London* are entitled to damages against Syria, then they were entitled to damages against Libya as well, damages which they could not pursue due to the United States' taking of their property.

8. Plaintiffs regret being forced to seek compensation from the United States, but they now have no other means of redress. But for the intervention of the United States, Plaintiffs would have two judgments from the U.S. federal courts against Libya. Plaintiffs' primary objective is to hold Libya accountable for the actions of its former government. Accordingly, Plaintiffs remain open to a negotiated solution which would obviate the necessity to seek damages directly from the United States. Until the United

---

[3] No. Civ. 98-3096 (TFH), 2007 WL 1876392, at *15 (D.D.C June 28, 2007) ("[T]he evidence and Hartford's arguments stand undisputed and establish Libya's responsibility for the bombing of Pan Am Flight 103. . . .") (finding subject-matter jurisdiction and denying in part Libya's motion to dismiss).
[4] 811 F. Supp 2d 52 (D.D.C. 2011) (entering a judgment of damages against Syria for its role in the Egypt Air attack which were subsequently revised to $51,574,997.89).

States indicates a willingness to pursue such alternative dispute resolution, Plaintiffs bring this claim for just compensation as required by the Just Compensation Clause of the Fifth Amendment.

## JURISDICTION

9.     This is an action for money damages to recover just compensation under the Fifth Amendment of the United States Constitution for the taking of Plaintiffs' property. Specifically Plaintiffs seek compensation for the taking of judicially cognizable claims against Libya for its sponsorship of international terrorism which caused the complete destruction of the Egypt Air Flight 648 on November 23, 1985 and the Pan Am 103 aircraft on December 21, 1988, the victims and policy holders of which were compensated by Plaintiffs according to Plaintiffs' contractual obligations under various insurance policies. This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and the Fifth Amendment of the United States Constitution.

## THE PARTIES

10.     Plaintiff Certain Underwriters is a unified insurance and reinsurance entity organized and existing under the laws of the United Kingdom.  Certain Underwriters was a plaintiff in two separate federal lawsuits against Libya under the Foreign Sovereign Immunities Act on behalf of select underwriters at Lloyd's London who provided liability insurance coverage for the hull of Egypt Air Flight 648, as well as liability insurance coverage to Pan Am at the time of the Lockerbie bombing on December 21, 1998. Certain Underwriters now represents those same members.

11. Plaintiff New York Marine is an insurance provider incorporated under the laws of New York. As another provider of liability insurance coverage for the hull of Egypt Air Flight 648, New York Marine was a co-plaintiff of Certain Underwriters in their action against Libya for the recovery of costs caused by the destruction of the Egypt Air Flight 648 aircraft hull.

12. Plaintiff Aviation & General is an insurance provider organized and existing under the laws of the United Kingdom. As another provider of liability insurance coverage for the hull of Egypt Air Flight 648, as well as liability insurance coverage to Pan Am at the time of the Lockerbie bombing, Aviation & General was a co-plaintiff of Certain Underwriters in both of the aforementioned actions against Libya.

13. Defendant is the United States, the actions of which deprived Plaintiffs of valuable property without just compensation.

## FACTUAL HISTORY:
## THE TWO ACTS OF LIBYAN SPONSORED TERRORISM

14. The factual history that pertains to Plaintiffs Certain Underwriters', New York Marine's, and Aviation & General's property interest in a valid claim against Libya arising from the Hull Destruction of Egypt Air Flight 648 ("Flight 648"), a Boeing 737-200 ADV passenger airplane, with registration number SU-AYH and serial number 211191, is described in Paragraphs 15-27, infra.

15. The government of Libya, and also separately the government of Syria, sponsored and supported the Abu Nidal Organization ("ANO") (a/k/a Black September, the Fatah Revolutionary Council, the Arab Revolutionary Council, the Arab Revolutionary Brigades, the Revolutionary Organization of Socialist Muslims), a known

6

terrorist organization, headed by Sabri al-Banna (a/k/a Abu Nidal), prior to November 23, 1985.

16.     The Defense Intelligence Agency of the United States Department of Defense, and other intelligence agencies of the United States government, determined that the hijacking of the Egypt Air Flight 648, on November 23, 1985 was conducted by members of the terrorist organization ANO, and that the organization and act were sponsored by (a) the government of Libya, which provided general and specific material support for ANO, and by (b) the government of Syria, which provided general material support for ANO and its terrorist members.

17.     The United States Department of State, Office of the Historian, Bureau of Public Affairs, in its report of Significant Terrorist Incidents, 1961-2001, lists the Egyptian Air Flight 648 hijacking and destruction of November 23, 1985 as a terrorist act that was conducted by ANO.

18.     The United States Department of State's Office of Counterterrorism's Background Information on Foreign Terrorist Organizations indicates that ANO received considerable support, including safe haven, training, logistic assistance, and/or financial aid from Libya and Syria.

19.     The substantial material support to and sponsorship of ANO by Libya included, but was not limited to, provision of the following: weapons; funds; facilities; airline tickets; free and unobstructed entry into, safe haven in, and exit from Libya by members of ANO; terrorist training in Libyan camps; use of the privilege of Libya's "diplomatic pouch" freight privileges to transport the weapons used by the ANO hijackers; official documents of all kinds, including the Tunisian passports that allowed

the ANO hijackers to travel; and actual operational assistance in pre-positioning of people and supplies for the conduct of the hijacking of Flight 648.

20. On or about November 13, 1985, ANO terrorist Omar Rezaq traveled from Beirut to Athens for the express purpose of participating in an ANO mission to hijack an airplane. Then on November 23, 1985, three ANO operatives, including Rezaq, used illegal passports, provided to them by Libya for the purpose of hijacking the plane, to board Egypt Air Flight 648.

21. Shortly thereafter, Flight 648 took off from Athens and headed in a southeasterly direction toward Cairo, its intended destination. Twenty-two minutes into the flight ANO terrorists hijacked the plane. A mid-flight shootout between an Egyptian Sky Marshall and one of the hijackers resulted in the death of a hijacker, the wounding of the Sky Marshall, and two stewardesses, as well as the piercing of the fuselage. After this shootout, Flight 648 was diverted to Malta.

22. The tower in Malta ordered Flight 648 to taxi to a remote parking area, after which four police buses then blocked both ends of the runway. The terrorists demanded that the Maltese airport authorities refuel the plane, and the Maltese airport authorities refused to comply with the terrorists' demands. The terrorists threatened to shoot one passenger every fifteen minutes unless the Maltese agreed to refuel the plane.

23. Thereafter, the terrorists identified two Israeli women and shot each of them in the head. The terrorists threw them out of the plane and onto the tarmac. Next, the terrorists brought three American passengers to the front of the plane, shot each in the head, and threw them out of the plane onto the tarmac.

8

24. Twenty-four hours after the hijacking began, while the aircraft was still on the ground in Malta, Egyptian commandos stormed the plane in an attempt to rescue the passengers. The Egyptian commandos entered the plane by destroying the passenger doors and the luggage compartment doors with explosives. These explosions caused the internal plastic of the plane to catch fire, causing widespread suffocation.

25. When the hijackers realized that they were being attacked, they threw hand grenades into the passenger area, killing and injuring passengers and igniting a fire inside the aircraft.

26. As a result of (a) the mid-flight shootout with the Egyptian sky marshal, (b) fire from the use of explosives by the Egyptian Commandos, and (c) the use of hand grenades by the terrorists, the airplane was damaged beyond repair and ceased to be suitable for any purpose beyond salvage.

27. Because of the catastrophic financial risk associated with insuring an airline, no single insurer or group of insurers is financially able to insure the entire risk. Rather, an airline obtains coverage using a "vertical placement," with each insurer or group of insurers assuming an enumerated percentage of the airline's risk. Plaintiffs Certain Underwriters, New York Marine and Aviation & General provided reinsurance for the aircraft hull and this event triggered the coverage in their policies. Certain Underwriters provided 53.579%, New York Marine provided 2.403%, and Aviation & General provided .858% of the liability insurance coverage which paid for the losses caused by the destruction of Egypt Air's Boeing 737, which was insured for $14 million.[5]

---

[5] *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 06-731(GK), Docket No. 109 at 17, 18-19, (D.D.C. May 14, 2012).

The insurers sustained additional reasonably foreseeable losses during the subsequent investigation of the loss, such as storage of the destroyed hull and legal fees.[6]

28. Paragraphs 29-36, infra describe plaintiffs Certain Underwriters' and Aviation & General's property interest in a valid claim against Libya arising from the Pan American World Airways Flight 103 Lockerbie disaster.

29. On December 21, 1988, Abdelbaset Ali Mohammed al-Megrahi, an agent of the Libyan Intelligence Service, in furtherance of the purposes of the Libyan Intelligence Service, caused the timed detonation of explosives concealed within the luggage compartment of Pan Am Flight 103 as it passed over Lockerbie, Scotland. In January 2001, Al-Megrahi was convicted of this crime by three Scottish judges in the High Court of Justiciary at Camp Zeist. In their statement regarding al-Megrahi's conviction, the judges also confirmed that al-Megrahi was an agent for the Libyan Intelligence Services and that Libya materially supported the attack.

30. Libya did not dispute Plaintiff Certain Underwriters' assertion before the United States District Court for the District of Columbia that al-Megrahi was a Libyan intelligence agent acting in the scope of his employment while carrying out the bombing.[7]

31. The government of Libya's substantial material support for and sponsorship of the attack included, but was not limited to, providing the following: the efforts of al-Megrahi and other Libyan intelligence agents; "MST-13" timers used to trigger the explosives; the plastic explosives themselves; and Libyan passports containing false identities.

---

[6] *Id.* at 17-18.
[7] *Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 98-3096 (TFH), 2007 WL 1876392, at *9 (D.D.C July 6, 2010).

10

32. With the support of the Libyan Intelligence Services, al-Megrahi and his co-conspirators created an improvised explosive device from plastic explosives, a cassette player, and a timed detonator.

33. The Libyan agents then concealed that device within a suitcase, which was checked on to Air Malta flight KM180, from Malta to Frankfurt. In Frankfurt, the suitcase was transferred to Pan Am Flight 103A, a feeder flight for Pan Am Flight 103, which flew from Frankfurt to Heathrow, where the suitcase was finally placed on Pan Am flight 103.

34. As Pan Am Flight 103 passed over Lockerbie, Scotland, the timer detonated the explosives, shattering a portion of the fuselage and causing the disintegration of the aircraft. All 243 passengers and 16 crew onboard were killed in the explosion. 11 further bystanders on the ground were killed by falling debris.

35. At the time of the Lockerbie disaster in 1988, Pan Am had over $485 million in liability insurance coverage from several insurance markets: Certain Underwriters provided 7.496375% and Aviation & General provided 3.0% of Pan Am's liability coverage for Pan Am 103.

36. In the late 1980s, Libya's role in the Lockerbie bombing was still unknown and the family members of the victims of this atrocity sought compensation from Pan Am, rather than from the Libyan government. In addition, the Libyan government enjoyed sovereign immunity at that time. Accordingly, on behalf of their insured, Plaintiffs Certain Underwriters and Aviation & General paid some $55,000,000 to compensate the families of the 189 U.S. nationals and 81 foreign nationals who died in the disaster.

## PLAINTIFFS' LEGALLY COGNIZABLE CLAIMS AGAINST LIBYA AND THEIR DEPRIVATION BY THE UNITED STATES

37.     In 1996, amendments to the Foreign Sovereign Immunities Act lifted Libya's sovereign immunity in relation to its state sponsorship of terrorism. On December 18, 1998 a group of Pan Am insurers, including Certain Underwriters and Aviation & General, filed a lawsuit[8] in the U.S. District Court for the District of Columbia against the government of Libya seeking indemnification for their earlier payments to victims of the Libyan attack on Pan Am Flight 103. Then on April 26, 2006, Certain Underwriters, New York Marine and Aviation & General filed a lawsuit[9] in the U.S. District Court for the District of Columbia against the governments of Libya and Syria to recover payments made pursuant to their insurance of the Egypt Air Flight 648 aircraft hull.

38.     In 2008, Congress passed the Lautenberg Amendments to the Foreign Sovereign Immunities Act, creating 28 U.S.C. § 1605A. 28 U.S.C. § 1605A(c) provides that a private right of action may be brought against foreign states that are or were state sponsors of terrorism and they will be liable to the victim's legal representatives. It included 28 U.S.C. § 1605A(d) which allows actions for reasonable foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which an action under 28 U.S.C. § 1605A(c) is based. These subsections do not preempt other applicable common law causes of actions, which were available to the Pan Am insurers. The Pan Am insurers

---

[8] *Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 98-3096 (TFH) (D.D.C filed December 18, 1998).

[9] *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 06-731 (GK) (D.D.C. filed April 21, 2006).

filed for retroactive application of the new amendments[10], as provided for by the statute, however the court dismissed their case based upon the United States' representations in its Statement of Interest, see Paragraph 48, infra, before any decision could be made regarding the applicability of the Lautenberg Amendment.

39. However, beginning in and around 2007, the United States in furtherance of its stated public policy of "normalizing" relations between the United States and Libya, a public purpose within the meaning of the Fifth Amendment of the United States Constitution, began a coordinated effort to take Plaintiffs' claims. Paragraphs 40 to 59, infra, enumerate the mechanisms by which the United States executed this taking.

40. On August 4, 2008, Congress passed the Libyan Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008) ("LCRA") which stripped the District Court of its subject matter jurisdiction over Plaintiffs' lawsuits against Libya for the two separate acts of terrorism that caused the destruction of the Egypt Air Flight 648 and Pan Am Flight 103 aircraft.

41. On August 14, 2008, the United States and Libya entered into a Claims Settlement Agreement[11], calling for the "termination of all pending suits" against Libya for "death, or property loss caused by" an act of "extra judicial killing, aircraft sabotage . . . or the provision or material support or resources for such an act . . . ."

42. On October 31, 2008, President George W. Bush issued Executive Order No. 13,477 pursuant to LCRA terminating all terrorism-related suits against Libya

---

[10] *Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 98-3096 (TFH), Docket No. 123 (D.D.C Apr. 3, 2008).

[11] *Claims Settlement Agreement Between the United States of America and the Great Socialist People's Libyan Arab Jamahiriya*, 2008 U.S.T. Lexis 72, entered into force Aug. 14, 2008.

13

pending in United States courts.[12]  In furtherance of this objective, this order instructed the Attorney General to seek the dismissal with prejudice of any terrorism-related claims against Libya.

43.     In addition, Executive Order No. 13,477 announced the United States' espousal of terrorism-related claims by United States nationals and ordered the Secretary of State to establish procedures to compensate those United States nationals for their terminated claims.

44.     Executive Order No. 13,477 provided no such parallel procedure for the claims of foreign nationals.

45.     On March 16, 2009, the United States submitted a Statement of Interest in Certain Underwriters, New York Marine and Aviation & General's Egypt Air Flight 648 case, arguing that LCRA and Executive Order 13,477 required that the case be dismissed.[13]  In its Statement of Interest the United States (a) conceded that it sought termination of Plaintiffs' claims and (b) stated its public purpose of "normalizing" relations between the United States and Libya.

46.     On January 7, 2010, the District Court, citing the March 16, 2009 Statement of Interest, dismissed Certain Underwriters', New York Marine's and Aviation & General's claims with prejudice for lack of subject-matter jurisdiction, stating

---

[12] Executive Order No. 13,477, 73 Fed. Reg. 65965, 65965-56 (Oct. 31, 2008).
[13] *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 06-731 (GK), Docket No. 84 (D.D.C. March 23, 2009).

"Congress has deprived the courts of the United States of jurisdiction over these claims. . . . That is the end of the matter."[14]

47.     The eventual award against Libya's co-defendant, Syria, totaled $51,574,997.89 including pre-judgment interest.[15] But for the taking of Plaintiffs' claims by the United States, Libya would be jointly and severally liable for that judgment.

48.     Similarly, on March 23, 2009, the United States submitted a statement of interest in Certain Underwriters' and Aviation & General's Pan Am case arguing that LCRA and Executive Order 13,477 require that the case be dismissed.[16] Once again, the United States conceded in virtually identical language that the "Claims Settlement Agreement, the Libyan Claims Resolution Act, and the Executive Order compel termination of all claims against Libya" and the underlying public purpose of "normalizing" relations between the United States and Libya.[17]

49.     On July 6, 2010, the District Court, citing the March 23, 2009 Statement of Interest, dismissed Certain Underwriters' and Aviation & Generals' *Hartford* claims with prejudice for lack of subject-matter jurisdiction.[18]

50.     By letters dated December 11, 2008 and January 15, 2009, pursuant to LCRA and Executive Order No. 13,477, the Department of State referred the claims of United States citizens against Libya to the Foreign Claims Settlement Commission.

---

[14] *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 06-731 (GK), Docket No. 94 at 11 (D.D.C. Jan. 7, 2010) *quoting Antolok v. United States*, 873 F.2d 369, 375 (D.C. Cir. 1989).

[15] *Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 06-731(GK), Docket No. 120 (D.D.C. May 14, 2012).

[16] *Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 98-3096 (TFH), Docket No. 141 (D.D.C March 23, 2009).

[17] *Id.* at 1, 4.

[18] *Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. 98-3096 (TFH), Docket No. 148 (D.D.C July 6, 2010).

51.	The Foreign Claims Settlement Commission imposed the "continuous nationality rule" although the Claims Settlement Agreement, the Libyan Claims Resolution Act, the Executive Order and the Referral letters did not mention the principle. On the basis of the "continuous nationality rule", the requirement that claims be held by United States nationals from the time of the internationally wrongful act until the espousal of the claim by the United States, the Foreign Claims Settlement Commission rejected all the claims by those Plaintiffs before it.

52.	On July 7, 2010, on the theory that they stood in the shoes of Pan Am, a United States corporation, and the United States victims to whom they made payments, Certain Underwriters and Aviation & General submitted a claim to the Foreign Claims Settlement Commission. They sought to recover the monies expended to resolve the wrongful death claims against Pan Am arising out of the Lockerbie disaster.

53.	On May 17, 2012 the Commission issued a Proposed Decision rejecting Certain Underwriters' and Aviation & General's argument that they stood in the shoes of their insured and finding that the Commission had no jurisdiction over their claim.

54.	Certain Underwriters and Aviation & General requested that the Commission reconsider the Proposed Decision, but on January 30, 2013 the Commission entered a final ruling that it could not assert jurisdiction over their claims.

55.	Given the Commissions' guidelines regarding the "continuous nationality rule" and its numerous and unambiguous rejection of claims by foreign applicants, Certain Underwriters and Aviation & General declined to submit an application regarding their claims against Libya stemming from the Egypt Air Flight 648 attack. New York

Marine, their sole United States co-plaintiff in their federal court case against Libya, did submit an application that the Commission eventually rejected.

56. On June 5, 2012 the Commission issued a Proposed Decision finding that it had no jurisdiction over New York Marine's claims on the theory that those claims were originally held by Egypt Air, the owner of the aircraft hull, even though at the time of the aircraft hull destruction New York Marine had a contractual obligation to pay Egypt Air for that loss.

57. New York Marine requested that the Commission reconsider the Proposed Decision, but on Feb 15, 2013 the Commission entered a final ruling that it could not assert jurisdiction over New York Marine's claims

58. The United States has deprived Certain Underwriters, New York Marine and Aviation & General of their property, the lawsuits against Libya, without any remedy in either federal court or the Foreign Claims Settlement Commission. This federal government has worked an unprecedented total extinguishment of jurisdiction over previously valid claims at law.

59. When the Commission rejected jurisdiction over Plaintiff's claims, it extinguished those claims. This was not the case under the Iran-United States Claim Tribunal, created by the Algiers Accord. Declaration of the Government of the Democratic and Popular Republic of Algeria, Jan. 19, 1981, 20 ILM 224 (1981). Under Executive Order 12294, President Reagan merely "suspended" claims in the federal court system. Executive Order No. 12,294, 46 Fed. Reg. 14111 (Feb. 24, 1981). Claims rejected by the Tribunal on a jurisdictional basis were "revived" in federal court. Thus,

17

the Algiers Accord did not maroon any claimants without a forum in which to have their grievances heard, as happened to Plaintiffs.

## CLAIM FOR RELIEF
### Count One: Unconstitutional Taking of Claims Regarding the Hull Destruction of Egypt Air Flight 648

60. Plaintiffs Certain Underwriters, New York Marine and Aviation & General re-allege and incorporate by reference paragraphs 1-13, 14-27, 37-59.

61. Plaintiffs seek compensation from Defendant for the taking of their private property for public use without just compensation. The United States' passage of LCRA, and subsequent failure to create alternative channels for the remuneration of foreign nationals, constitutes a taking of Plaintiffs' property interest in viable, judicially-cognizable claims against Libya for the stated public purpose of creating an international agreement to "normalize" relations between the United States and Libya. Such conduct, without just compensation, violates the Just Compensation Clause of the Fifth Amendment of the United States Constitution.

62. Plaintiffs are entitled to just compensation as a result of the taking of their property, valid, judicially cognizable claims against Libya.

### Count Two: Unconstitutional Taking of Claims Regarding the Bombing of Pan Am Flight 103

63. Plaintiffs Certain Underwriters and Aviation & General, re-allege and incorporate by reference paragraphs 1-13, 28-36, 37-59.

64. Plaintiffs seek compensation from Defendant for the taking of their private property for public use without just compensation. The United States' passage of LCRA, and subsequent failure to create alternative channels for the remuneration of foreign nationals, constitutes a taking of Plaintiffs' property interest in viable, judicially-

cognizable claims against Libya for the stated public purpose of creating an international agreement to "normalize" relations between the United States and Libya. Such conduct, without just compensation, violates the Just Compensation Clause of the Fifth Amendment of the United States Constitution.

65. Plaintiffs are entitled to just compensation as a result of the taking of their property, valid, judicially cognizable claims against Libya.

WHEREFORE, Plaintiff prays for judgment against the Defendant, the United States, as follows:

A. Recovery in the amount to be determined at trial representing just compensation for the taking of Plaintiffs' claims against Libya, together with prejudgment and post judgment interest, costs, and attorneys' fees; and,

B. Such further relief as the Court deems just and proper.

July 31, 2014

Respectfully Submitted,

Steven R. Perles (No. 326975)
Edward MacAllister (No. 494558)
PERLES LAW FIRM, PC
1146 19th Street, NW, 5th Floor
Washington, DC 20036
Telephone: 202-955-9055
Telefax:    202-955-3806
Email: sperles@perleslaw.com

Attorneys for Plaintiffs